Next up is Envoy Technologies v. Cubic Corporation, Appellate No. 25-2112. Good afternoon, Your Honors. May it please the Court, I'm Jeff Kaplan for the Appellate Envoy. I'd like to reserve three minutes for rebuttal, if that's okay. Thank you, Your Honor. Your Honor, I want to begin, before I turn to the District Court decision, we seek to overturn to provide context with one section of Cubic's brief that I want to discuss in the context of the decision, and that is with regard to the tolling. Now, with regard to these tolling doctrines, Cubic has only put forth three arguments. It's right in the table of contents. First, they've argued that we forfeited these arguments below. They've gone so far as to tell you, and this is at page 46 of their brief, Envoy has never made these arguments to Judge Chesler or cited any of the cases it cited in its opening brief. Well, not only are the arguments the same, but the main caseload upon which it relies, this Court's decision in Drennen, Oshiver, and in American Board of Medicine, those three decisions are, in fact, all cited in the lower court brief for the same proposition that they're cited here. So, there was no forfeit. The second point they make is that they say, well, you put tolling at issue in the complaint, but that's simply the wrong standard. You can plead whatever facts are for tolling, but what's supposed to happen is dismissal is only appropriate if the face of the complaint indicates inquiry notice. Well, let's look at what was before the district court on that point. The district court had representations about a concern in 2010, and a statement that says, an allegation that says, because of something Cubic said or did, it was not, quote, it was not cost justified to do anything further from the face of the complaint. Doesn't that demonstrate a lack of diligence which is required for the two doctrines that are cited in the complaint? Yes. No, Your Honor, for this reason. The inquiry notice is when something, if I could state it sort of loosely but practically, when a flag should have been raised in our head. In 2010, we put in an allegation that Your Honor just read, which is that they made some statements to us about what their revenue was that we later in 2021-22 turned out to be false, but there was no notice and no information and no allegation that there was anything in 2010 that would have led us to believe they were not complying with the license. Well, what about the allegation in the complaint from 2006 that says, quoting from the complaint, Cubic Advised Envoy, it was used in the XIPC software beyond the scope of the Windows NT95 platform specified in the amendment, close quote. I mean, isn't that another indicator for the district court to have relied upon? Well, no, it couldn't be because, Your Honor, when they advised that they were using it beyond the scope of that platform, that actually shows the diligence, because at that time, what we did was we executed the amendment, we did a new license that expanded to cover that use, and that resolved that matter. That had nothing to do with the multi-CPUs. But why didn't you take advantage of the audit? Like, there was an audit right, but the audit right is this way. As this court has said in that sheet metal case and in the Handley case and some other cases we cite, the basic idea behind the tolling is that when you get something that gives you inquiry notice, you have to exercise diligence. The audit right gives Envoy one tool, a good tool, admittedly, but a tool to exercise diligence. They could say, hey, now that I have this inquiry, I see something is maybe a little off here. I saw something in the market. I'm going to come audit you. But as this court said itself in sheet metal and again, in a number of other cases, you don't have to constantly audit when they're telling us every year, hey, we want to renew our license and it's single CPU, and there's nothing to put us on the audit. The audit is just a good manner that we had available. Here's the trick. Tolling is just, it's fundamentally an allocation of equitable powers. It's an equitable exception to a legal principle of a statute of limitations. It seems very strange when we want to talk about principles of equity and fairness to sit there and say, you didn't just have one tool. You had like the best tool. It's a super tool and it can be used at your discretion. And to sit there and say, gee, you know what? We just never wanted to use that. We had no pattern or practices using that. We had no protocols for using that. We just decided never to use it. But now that we never used it, please make it all right. Please make it okay that we never used our super tool, one that we probably had to pay a price for in contract negotiations. People are going to fight over how thorough or detailed that audit right is. You bargained for a good one. And then you said, we don't want to use it. We didn't use it. Don't hold that against us. Well, I would respectfully push back on that for this reason, Judge Phipps. The reason is, remember, every year, it wasn't just these renewals. As we pointed out in our brief, there was discussions leading to those renewals. Now, Cubic, I think now they've been taken private. But during a large part of this, they're a large company. They're a public company. They're renewing this license every year. They're saying, yes, we need the single CPU. And they're telling us when their license, when their use goes beyond the license. They're telling us, hey, we need to expand to all Windows platforms, the point that Judge Schwartz made. And so we then expand it and do a new license. They're telling us. Let me just tease this out. Because you've got a judgment against you. And the judgment against you says that we can't infer from the complaint that they were used on multi-unit CPUs, right? Now, I think that might be, I think that I can see grounds for making a reasonable inference that you're running a traffic light system. And it's probably going to be on a server as opposed to one person's single computer, right? But if we believe that, and if we make that inference, shouldn't your client have made that inference too and used its audit right? So it strikes me that the key that unlocks your case is one that is the inference that it had to be on multi-CPU computers. But that key also locks you out of equitable tolling. I take that point is very well taken, but for this issue. And it's the issue that is based on the evidence Qubit put in. Remember, one of the issues we raised here is they put in evidence that servers at the time that were available could be single CPU based or could be multi-CPU based. That's outside our ability to consider, isn't that right? I'm sorry? We're not able to consider any of that because that wasn't presented as part of the pleading or integral to the pleading. That was sort of tutorial information. So how can we consider all that? I'm responding to Judge Phipps when he says, and it's correct, he's saying that shouldn't we realize that it's on a server? Yes, but at the time there were servers of both types available and Qubit was telling Envoy we're using single CPU ones every year when they renewed those. So I take the point what you're saying, Judge Phipps, is that we should have recognized based on what they were doing that it was worth auditing and investigating. But they were confirming every year that it was single CPU computers and those were available on the market. If you believe them and didn't exercise your audit right, wouldn't it be an unreasonable assumption or an unreasonable inference for us to then say that your case survives motion to dismiss because it's reasonable to think that they had to be using one multi-CPU? I'm sorry, can I ask you to repeat that? So I'm just saying is if I'm plotting a path for victory for you to beat the motion to dismiss, you have to show that you've got plausible allegations that they were using on a multi-CPU computer. You don't have too much, okay? You have very, very little as far as like you got some contracting calls bad and stuff like this. But it strikes me that your strongest case is the inference that this is a big software system and it had to be used on multi-CPU computers. That's not what you want to do. The strongest case, as we allege, and I forgot to bring my copy of the complaint that appears there, is they told Envoy that. They were discussing and what we pleaded. They said to Envoy, we haven't been honoring a single CPU. We've been using it on large enterprise servers. They told Envoy. Then it led to future discussions and that's what it was based on. It was not based upon the inference of, well, you know, since they're making traffic light control systems, therefore, it must have been on multi-CPU computers. It was based on discussions they were having with technical people at Cubic who told Envoy. And then Envoy investigated further, immediately tried to do the audit at that time, which is also pleaded, tried to get more information and Cubic would not give them any information. But in your opposition to the motion to dismiss before the district court, there was representations about the so-called technical requirements and how complicated the Carlsbad system must have been. There is nothing in the complaint from which one could infer that. The complaint alleges the end fact, which is that they were using multiple CPU computers because Cubic had advised us of that repeatedly over the course of months. You're talking about the Carlsbad stuff and you're talking about the activity in 2020-21? I'm talking about, the Carlsbad was the example we found, but the way that this arose originally- When was that? Tell me when that was. Originally in 2021- Was the first time. The first time they were speaking, you know, Cubic and Envoy and a technical person at Cubic said to Envoy something, I mean, I wasn't on that call, but it's in the complaint to the effect of, you know, we're basically not honoring the CPU, we're just, you know, putting it on multiple- Let's go back to the Carlsbad thing, because the way your complaint is drafted, and I'd like to depart from the statute of limitations for a moment and talk about just the pleadings as they stand, forget the statute of limitations. I have several questions on this subject. So there were assertions that Cubic installed and used the XIPC software on multi-CPU computers. How do we know that from the pleadings? How do you know that, just as an assertion? What from the pleading would tell us there is a factual basis for that? If you're- I would say that is the fact, but the factual basis for it, and again, I've got to go- Want to go get your complaint? May I do that? I see I'm running out of time. That's okay. We're going to use the rest of this time to ask questions that we have. So take your  What we say is that as soon as I've learned of Cubic's misrepresentations in 2021 and that Cubic's use of XIPC was not what Cubic had been misrepresenting, and I won't read the whole rest, but it goes on to explain- What paragraph are you in, just so I can follow along? That was paragraph 37, Your Honor. And I think there's actually more. I'm having trouble locating- I was looking at earlier. I was looking at 24. Cubic knowingly delivered XIPC to numerous customers who identified multi-CPU computers on which XIPC would be used. I had- My question was focused on how they knew it at their shop, and then my second question goes just exactly where you're going. Like, then how do you know what's happening with the customers? So one was what they use? That's okay. And the other was deployment. And we don't have an instance of this happening, except for Carlsbad, which I'll come to in a second. The complaint just says they were doing it, and they were letting their customers do it. Correct, Your Honor. And the- I'm not sure if you're asking now about the allegations that we're using the multi-CPU computers, or again, when we knew about it. I'm not talking about when you knew about it. I'm talking about the facts that they were doing it. So I would say, Your Honor, what we allege is, and it's in many places, but a good example is what I think Judge Phipps pointed to. We allege that they knowingly delivered it to numerous customers who identified multi-CPU computers. Your factual basis for that. What would be your factual basis for that? Because I think in reading Judge Chesler's opinion, I think his frustration, at least seemed to me, was that he wanted to know who did it and how do you know it in the complaint. And there's a question as to whether that's a proper prism to look at a non-fraud complaint. I get that. But what is your factual basis for that statement? The reason we allege that, if that's what you're asking, is again, because initially, Cubic told Envoy that. There was discussions that went on for months where they continued telling him. Then I got involved. And what I would suggest, Your Honor, is that the fact that I'm pleading is that they were using multi-CPU computers and delivering it to customers. But you're saying, you know, that the factual basis is someone from the company told you, and it's those references to those communications in 20 and 21 where you're trying to settle. Well, they were trying to settle this. Correct. But I guess what I'm really trying to argue, and I see my time is up. This is our time now to ask the questions. Okay. What I'm really trying to say is that if the fact I need to establish is that they used it on multi-CPU computers, that's the fact I'm pleading. It's not some conclusory thing, like a legal conclusion or saying they breached the contract. Judge Chester gave your client an opportunity to amend to add the six-CPU system that was represented to the court, and he gave leave to amend. Why wasn't that just added? Because what his opinion said is what happened was in the briefing on this motion to dismiss, we briefed the whole issue, everything we're doing here. We dropped the footnote in that brief that said during that briefing. We found another. I read the brief. We found another system and he limited our ability. So we didn't want to just sue on that one system and the rest would be dismissed because that's what his amendment was limited to. So we just said, we'll take the whole thing up to the circuit because the original allegations that they're using it on multi-CPU computers is the facts that were alleged. And what the district court wanted is he wanted us to say who the customers were, but that's just not required by the case law. And I would argue, Judge Schwartz, that if you look at many, many of these indirect infringement cases, both in the copyright and in the patent area, both of them, the main sort of policy behind the inducement statute is when you have these cases where people are selling stuff that large volumes of consumers are using. Like if I'm selling software that bypasses Microsoft's copy protection and you can make hundreds of copies of Windows without paying, or the Napster case that we cited where the copy, they're made specifically when you can't identify all the infringement. This is also a breach of contract case, right? It's not just, it's also, unless you're foregoing your breach of contract claim, there's a breach of contract in this case, yes? There's also a breach of contract, correct? Okay. So now I want to just move from that subject, and I just want to move to the Carlsbad documents. Because let's assume that the law said you have to give an example, an instance of a, give me a situation where this occurred. That is the Cubic tendered to a customer the software, and your theory is, and that software was being used beyond the license. Now you attach to the complaint, it's the city of Carlsbad documents. And I just want to make sure that I understand them, and I'm going to ask you to walk me through that. Is there anything on those documents that would tell us that it was the XIPC software that was tendered? That's the first question. The second question, is there anything from those documents from which we could infer that the enterprise server was the multi-CPU that would have been broader than the license? So walk me through those documents. So on your first question, the documents don't say it's XIPC, but there's a reason for that. The reason for that is the municipality is buying a traffic control system. They don't know what messaging software is buried in there by Cubic, and there's probably 20 other softwares that do other things. So how would Judge Tesler have known that? Because we alleged that it had XIPC, because again, they had told us that we're putting XIPC in all our traffic controls. They said it in their briefs in the litigation, and I'm not sure if it's even in their appeal brief, but it's definitely in the district court briefs. They never disputed that. Their answer was they said it's licensed because you have no proof how many CPUs it had. So the answer to your first question, Your Honor, is the documents just show that the traffic control system that Cubic was making was sold to Coral's Bed. The allegations we made to supplement that is that it had XIPC in it, because they had told us that the entire purpose of the contract was for them to build this into their systems. Your second question about- Was how do I know that it was being used on a multi-CPU? Is it from the enterprise server? Because it was an enterprise server, and if you look on that price list that was part of the record, the enterprise servers are the ones that are known term apparently in the law. Right, a 17 to 64 process, and that's how the link would apply. You've explained, you've answered my question. Thank you. Let me see if Judge Beebe has a question. I did have one. We haven't really talked about this. What if any allegations in the complaint show that Cubic had the right and ability to control the customer's infringing activity? I looked and I just couldn't find anything on that piece of the curious liability. Well, I would say that that is in the actual attachment, the OEMA agreement itself. And the reason for that is, and I want to just clarify one thing that Judge Schwartz mentioned in the hypothetical where you said they were delivering the software. Keep in mind, they weren't just delivering XIPC software. They were delivering an entire physical system with networks and servers. That's what those documents show, and that's what was told. So the reason they had the ability is that Cubic was, as we say in the complaint, was putting the XIPC software, integrating it into an entire system and delivering a whole bunch of hardware and software. That seems to support an allegation of direct infringement. I'm trying to understand on a vicarious theory, what is there in the that shows even if they're not doing it, that they're retaining this kind of control that would be needed for vicarious? They could have just delivered. The control is that they could have simply delivered that system using single CPU servers that were available at the time, or they could have delivered infringing systems. All right. So take me to where in the attachment, whatever attachment you're referring to, what are we, where is it in the appendix that I should look to understand? Second Amendment Complaint 245, the invoices, the resolution number. Is this the attachment A, the invoices? No, no, no. I misspoke when I said it's an attachment. I remember now it was separately. Counsel, did you mention the OEM? Yes. Appendix 88. Appendix 88. Thank you. But at Appendix 88, you'll see that it's Section Paragraph 8 of that, the second paragraph. It says OEM, that's cubic, will not deliver any product, including any portion of the product, to any prospective customer without the prior receipt of the license payment. And unless the products have been authorized by the licensor for the use computers and platforms identified by the customer. But that doesn't tell, go ahead, Judge Bemis. It doesn't say anything about retaining right and control. It's about just a precondition for who's authorizing what will notify you of a breach, but it doesn't say anything about we're going to be overseeing this or auditing this or keep some spy software on it. I don't see anything in this paragraph you're pointing to. This is the best thing you can do? Your Honor, I would disagree that the overseeing and supervising is even required. For vicarious? Are you sure? For vicarious. Set aside direct. Direct doesn't require that, but vicarious. Well, I think that for vicarious liability, and these cases are in our brief, if they have the ability to deliver that system on a single CPU or a multi-CPU, and they know that the multi-CPU one is infringing, and they deliver it anyway for a profit, then that can give rise, that gives rise to vicarious liability. That sounds like direct to me. Or induce it. Or induce it. It doesn't sound like vicarious. I don't think it's direct with all respect. It may also constitute inducement, but whether it's inducement or vicarious, the cases like the Napster case specifically has some very good language about this. It says, if you have the ability to control the infringement, and in fact, Your Honor, if I can grab the brief, I can read you that exact language. The Napster case says it doesn't have to be an employer. You're an employer. It doesn't have to be master servant. It's basically any attempt to profit off the infringement by supplying a system that you know is infringing. Let me just see if I can then. I know this quote from Napster is in our brief. I apologize for this. Because I think what we're thinking about are the elements from, as recited in Leonard, the right and ability to supervise or control the infringing activity and a direct financial interest. I think what Judge Bibas was driving at was we don't, we see things in the OEM, but we don't, that talks about what the defendant can do, but it doesn't talk anything about it. It's controlling the infringing activity of its customers. It just gives it the modality to commit infringement, which is not controlled. I'm sorry. I'm still trying to find this. It's by delivering the system on multi-CPU computers when they can just as easily deliver it on a single CPU. Here it is. Here it is. This is A&M Records versus Napster. This is at page 17 of our brief. The ability to block and infringes access to a particular environment for any reason whatsoever is evidence of the right and ability to supervise. Turning a blind eye to detectable acts of infringement for the sake of a profit gives rise to liability. And Napster actually was quite an analogous case. They were just providing other people the ability to do stuff that was unlicensed. So they had the ability to answer Judge Brewer's question. They had the ability to control that infringement. Just tell the customer, we can deliver this to you, but it has to be on single CPU computers. It can't be on multi-C because those are not licensed. That was the ability to supervise and control. That's it. Okay. Counsel, I have a rebuttal. Thank you. Your Honor, to clarify, have I waived my rebuttal time at this point? No, no. You can do what you want. No. No, I don't want to. You're on our time. You've got three minutes. That was all us. Okay. Thank you very much. You're welcome. May it please the Court, Stuart Pollack on behalf of Cubic Corporation. Let me begin with the Napster cases and the questions you asked about vicarious liability. Now, in cases like Fonavisa, Napster, Grokster, these are all what I'll call the flea market cases today. These are kind of like electronic flea markets. These are all cases where Grokster, Napster, Fonavisa, they control their websites. They had full control and vicarious liability applies there because they make their money through people infringing on the websites that they control. Now, in those cases, the facts are very different. There was no question in those cases that acts of infringement occurred. For example, in Fonavisa, the sheriff had raided the flea market multiple times. In Napster, anyone could go to the Napster site and see the infringing materials. All the public knew about this. In Grokster, a statistician showed that 90% of the materials on Grokster were infringing materials. So there was no question that an act of infringement occurred. Here, we don't have that. Let me correct something that maybe your honors are confused about. My learned friend referred to an enterprise server. That server is not being used with the software that's at issue here. We're talking about the Carlsbad documents. That's right. How do we know that's true? Because we are stuck with the pleadings and factual matters have to be taken as true. Your colleague gave us a mechanism to connect representations in that document, the XIPC price list, which defines enterprise server, and then the representation that as part of the software package, XIPC would be part of it. You got to point us to some allegation in the complaint that requires us to accept what you just said. In the complaint, there's actually nothing. There's no way to understand what's going on at all. What's in the documents that we're permitted to consider? In those documents, we have no idea. Looking at the documents and the attachment, there's no way to determine whether there's software that has XIPC on it. There's no way to determine if it's a multi-CPU computer. There's nothing from there. Nothing on the documents. Nothing in the documents. Below, counsel argued a little differently from here on appeal, that on the first page of the document attachment B, I can get you the page for that if you want, there's a reference to our ATMS Now software. There's no reference there to an enterprise server. It just says server. There is a substitute page. Right, so Carl's back has a bunch of equipment that is sold by your client that says enterprise server. Your adversary points to a document in appendix 364 that says enterprise servers contain 17 to 64 processors. Those are multi-CPUs. He makes a representation that there's a factual allegation in his complaint that we have to accept as true that the package include was had within it XIPC software. Are we stuck with that for the purposes of our perspective in reviewing a motion to dismiss under Rule 12.6? I mean, none of that should really be considered at this point. None of it should be considered. It's an allegation in the complaint and attachments to the complaint. Well, it's not, yeah, the problem is it's not an allegation to the complaint. And at no point below did they point to that. Are you isolated to just the vicarious liability or are you talking about the other forms of copyright and breach of contract liability? Because it strikes me that, you know, if we're in a notice pleading regime, you don't notice what they're suing you for. They think that you're using your clients, using their software on multi-unit CPUs. That's their complaint. You know it. You can now defend it. You can answer. You can do other things like this. So maybe you can sit there and say, gee, they've never said that they've got the control needed for vicarious liability. Smart place to start, by the way, I think, like that's the low-hanging fruit. But like what more notice you want? They told you, you're using multi-unit CPUs. You're done. You can answer. We can go into discovery. We can find out were they or weren't they. But don't you have notice right now? No, not really, because this is an accusation. There's an accusation that we use multi-CPU, but there were no facts underlying that. It's on information and belief. OK, not all of them are. Information belief, I agree with you. That's very weak. I think there should be way more case laws saying how weak that is. But it's not all information belief. And so I guess my point is, don't you know? You can sit there and say, we don't have a whole bunch of facts. We don't have a bill of particulars coming at us with this. No, but that's not what Rule 8 wants. Rule 8 is not designed that way. And so when you get this, if your client called you up and don't waive any privileges and said, hey, what are they suing us for? Wouldn't you just say they think they're suing you because you're using the XIP software on multi-unit CPUs? Isn't that what you would say when you read this? Don't you have notice of that? Yeah, I think if we look at, especially Twombly, right? So let's take the same thing with Twombly. The allegation was that Bell Atlantic and the other companies were involved in an agreement to violate the antitrust law. And the basis for that was, well, there seemed to be parallel behavior. If you ask, well, now don't you know what Bell Atlantic is being accused of? Yes, we know what they're being accused of. But the Supreme Court is asking for more than that now. They're asking for facts that make that plausible. So I know what we're being accused of. But there's nothing here that makes it plausible that we're using a multi-CPU. And what can really happen here is a real possibility, is that we go through all of this discovery. They're going to have to serve subpoenas in all these companies. We don't know what they're doing. And then we find out there's just nothing there. And yet we've spent millions of dollars in discovery. That's what Twombly, that's what... So what would make this cleaning sufficient to warrant the next step, which is responsibly an answer in discovery? Yeah, I mean, if they could point to an instance where a multi-CPU computer was used, and let me make it clear that that's not plausible, that's not really plausible. Let me just tease this out. Let me just think of, let's say it's not XIPCS software, but let's just say it's karaoke software. And so what happens is now someone says, you know what? I think they're using this karaoke software late night hours at bars throughout the country. You might come back and say, you know what? I haven't identified a single singer at that late night bar who was drunk and singing karaoke at one in the morning. And until you tell me who those singers are at all those bars, it's not plausible. Isn't that a little bit saying? There's no karaoke claim until you can tell me who sang using this infringing karaoke software at two in the morning. And which song? Was it You Love That Loving Feeling? Yeah, yeah. Which song was it too? I mean, that's not notice pleading. In the case you're, I think, referring to, there was no question that the music was being turned into karaoke songs, which is an infringement of copyright and then being distributed. So there was no question that the fact of infringement had occurred. This is a little bit different. No one knows whether the software, you know, we just, we're like Microsoft. But what if there had been a question there? What if someone said, no, that's not plausibility. Give us the names of the singers at two in the morning and the songs, as Judge Bibas says. Singer, song, bar, date. Otherwise, we don't know. Well, I'm not saying there's a formal requirement to always to identify. I think that's a good place to start, I think, because there isn't. But in this situation, in the facts in our case, there's no, there's just accusations. There's nothing behind the fact that it's multi-CPU. Behind the fact. Now, that sounds like fact pleading, which was the pre night. No, I think it was a telling slip of the tongue because that was the system superseded by the federal rules of civil procedure in 1938. You are trying to resurrect fact pleading. And I think when we're talking about wild-eyed conspiracies in Tuambo, that's not like a plausibility issue. Did a whole bunch of people come up with some crazy scheme? That's a little different from fact pleading, which is, it's perfectly plausible. You got a license for a cheaper thing and you sold a more expensive thing and it's just, okay, who, what, when, where, how, and why. And I'm just not aware of case law that says they have to write the names involved in the first paragraph of the newspaper article. Yes, yes. But here we have much less, right? What system is it that is multi-CPU that we have sold? Now, I agree, if all systems were multi-CPU, yes, that would make it plausible. But today, most computers, not that it's a very popular record, are single CPU. I think my learned friend acknowledged that. So there isn't anything making it plausible that a multi-CPU is being used. It's simply an accusation that resulted after we advised them that we would be adding contracts. If we take your assertion, Judge Phipps said to your friend on the other side, well, this is software designed to control a whole bunch of traffic lights. Could it be plausible to infer that at least something involving that kind of complex, coordinated, very few towns have only one traffic light. They usually have a bunch of traffic lights. And often there's some synchronization with them. Isn't it at least plausible that if you're managing a whole system like that, that multiple CPUs might well be involved? I actually don't think it's plausible, but that's outside the record. But there's certainly nothing in the complaint that is making it plausible. There's nothing stated there about what your honor has addressed. I mean, like how many traffic lights do you think a single CPU computer could coordinate and synchronize all at one time? Any idea? I don't have that. That's not part of the record. I don't have that information. No, no, no. I'm just trying to think here. I don't know. Yeah. Yeah. I mean, look, not that this is part of the record, but the laptops today are more powerful than those multi-CPUs back when we signed an agreement with them in 2003. But what we do have in front of us is we know Carlsbad got one of these complicated systems. We know that Carlsbad's equipment list included an enterprise server. We know enterprise servers from the XIPC price list is 17 to 16 processors. From that, can't we infer at this stage on notice pleading that it's plausible that the XIPC software was used outside the license? I actually disagree factually with much of what you just said. None of that's pleaded in the complaint. I read exactly what came from the documents. Your adversary pointed, I'm going to ask him to identify where in the complaint he links the XIPC software to the Carlsbad purchase order. I get that. Yeah. Yeah. I mean, there's a server on a first page, and then later there's some add-on options that refer to an enterprise server. Right. Only the first page is what they raised below. They never highlighted or anything else below. We're on de novo review. We're on de novo review. We're looking at the record anew. Okay. Right. Okay. Well, there's nothing pleaded in the complaint about an enterprise server. I don't know how anyone or Judge Chesler was going to ever recognize that. I didn't recognize it. It was already addressed. Can I pivot to maybe where your friend on the other side started? Okay. I think the biggest concern for him was statute of limitations, and he wants to say how he gets out of that. Right. I'd like to, if he's so worried about how he can get out of that, I'm kind of wanting to hear from you in terms of why you think that should, on a motion to dismiss, a little awkward timing for that, obviously. But I understand why defendants want to push that issue. It's awkward, but I understand why you want to push it. What's your take? We've got differing statute of limitations for copyright and breach of contract. Best case scenario, let's just say that you lose on the sufficiency of the pleadings, and we're only going to carve up what's in play in terms of statute of limitations. What's your take? What's left of this case if they state claims for, let's say, breach of contract, let's say, direct copyright liability, and let's say, inducement-based copyright liability? How much is left? Is it all out on statute of limitations still? No, no, no, and that's not what we're arguing. It would be very limited, and this is important to both parties, to six years. It is a very small amount of damages. That's why I think a plaintiff envoy wisely raised statute of limitations and equitable tolling, and the case isn't worth doing if they're not going to be able to go back 20 years. So that's why that's very important to the parties. So, yes, there would be a case for the period of six years, but we're talking about- And it's six years for both breach of contract and copyright? No, copyright is three, and breach of contract is six. So the best they're getting is six on breach, and then- Right, and then three on copyright. But I do have the red light, and so- You do have the red light, and we don't have any further questions for you. Thank you, Your Honor. Thank you for your argument. Thank you, Your Honor. First of all, my friend distinguished all of those cases on indirect infringement by saying, there, we know that there was third-party direct infringement. But here, they were delivering the software that they installed on a multi-CPU computer, delivered it to the customer, and trained the customer on how to use it. How do we know that? That's what it says in our- But it's just an allegation. It doesn't tell us who, what, where, or when. Is there a problem? Is Judge Beeb is correct that your best argument is this is notice pleading, not fact pleading? Well, I would maybe add to that argument. It's not that it's only notice pleading, not fact pleading, but what my colleague's asking for is, what's the facts that back up the facts you're pleading? We don't need an inference based on traffic control systems that, you know, maybe they use multi-CPU computers or maybe not. All that technical inference is not needed because our complaint at paragraphs 24 and 25, and this is at appendix 250 to 251, specifically alleges that they were installing it on multi-CPU computers in violation of the license and delivering it. And I would point out that, if I could return to the indirect infringement issue he raised, in the cases that he cited in Napster, in Fonavisia, in any of those cases, they were just independent parties that were coming to some trade show to look at some material to buy. It was the fact that the alleged indirect infringer had the ability to sell stuff that they knew would cause infringement, and they did it anyway, knowing that they shouldn't have been doing it. And in this case, they know that they have an alternative to sell. So that's what I would say about that. And again, the facts that we're pleading, we don't have to plead facts to back up the facts. Under the standard they're advocating for, if I had a sworn declaration from Kubrick that said, we swear under oath we have installed this on hundreds of systems that all have multi-CPU computers and said nothing more, I'd have the same allegation, and he would say that's insufficient to plausibly plead that they did something improper. And that just can't be the law. That is the fact I have to prove that there's multi-CPU computers, not the facts that back up that fact. And finally, on this limitations issue, I want to point out, and this is critical, because this goes directly against this court's precedent in a number of the cases we've cited. It's not, let me say, fair or appropriate, I think, at this stage of these proceedings to talk about going back 20 years. Right now, we don't have evidence that they were violating the license for 20 years, or 10 years even. The first evidence in this record on dismissal that you're supposed to look at on the face of the complaint and the attachments, there's a 2010 statement you Your Honor, Judge Schwartz, but that statement doesn't say anything about what they're doing. That statement just says they told us something that we found out later wasn't true. The first indication in this record of anything being done beyond the scope of that license is the 2018-19 Carlsbad system that we learned about after being told in 2021. There is no evidence of them doing anything improper before that. Now, maybe if we're permitted to take discovery, we'll find that. But to say that we should have audited this thing for 20 years when we had no evidence, not notice pleading, but no evidence of even the wrongful conduct before 2018 would be like saying that the patient should sue the doctor for medical malpractice, not right after the surgery, not two years later when the tolling applies and he found out, but 15 years before the physician did the surgery. We couldn't have audited something 15 years before we have any evidence that they even did anything wrong. I see my time is up. Yeah, counsel, I do have one question. I just want to make sure I'm referring to the paragraph that you say connects the XIPC software to the Carlsbad project, because it's not an exhibit B. It's not, and nowhere on exhibit B, the Carlsbad document is XIPC referenced. You mentioned in your opening arguments to us that we could determine the link from an allegation in the complaint. And I just want to confirm that you're referring to paragraph 25, which is appendix 250 to 51. And that is true, but another paragraph that says similar allegations is 65. 25 and 65, Your Honor. And the 65 is appendix 260. Appreciate that, counsel. Judge Bibas, anything further? No, thank you. Okay, great. Thank you, Your Honor. All right, counsel, like your predecessors, thank you for very helpful arguments. The court will take the matter under advisement, and the court is going to take a break. We'll take like 10 minutes, and then we'll be back out for our final argument.